LAW OFFICES OF RICHARD A. ALTMAN
Attorneys for Plaintiffs
285 West Fourth Street
New York, New York 10014
212.633.0123
altmanlaw@earthlink.net
artesq@earthlink.net

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

JEANNE MARCHIG and THE MARCHIG ANIMAL
WELFARE TRUST,

|                        |                              |
|------------------------|------------------------------|
|            Plaintiffs, | 10 cv 3624 (JGK)             |
|                        | ECF Case                     |
|         -against-      | <u>AMENDED COMPLAINT</u>     |
| CHRISTIE'S INC.,       | Plaintiffs demand trial by jury. |
|            Defendant.  |                              |

-------------------------------------------------------------------x

Plaintiffs JEANNE MARCHIG and THE MARCHIG ANIMAL WELFARE TRUST, by their

attorneys, Law Offices of Richard A. Altman, for their amended complaint against defendant,

allege as follows:

<u>INTRODUCTION</u>

1.  This action seeks damages caused by Christie's  negligent and erroneous attribution of

a drawing which plaintiffs consigned to it for sale.  As a result, Christie's, one of the most

prominent and expert auction houses in the world, sold the drawing for a price that was a fraction

of its actual value.

2.    The erroneous attribution, and plaintiffs' damages, were proximately caused by defendant's willful refusal and failure to investigate plaintiffs' beliefs about the drawing, and to discharge its fiduciary responsibility to attribute the age, origin and creator of the drawing accurately.

3.    The drawing was owned by plaintiff Jeanne Marchig and her late husband, Giannino Marchig, for over fifty years.

4.    Mr. Marchig believed that the drawing dated from the 15th century and was a work of Domenico Ghirlandaio, who was a teacher of Michelangelo.

5.    At the time of the consignment, plaintiff Marchig told defendant that she believed it was a work of the Italian Renaissance, expressed her late husband's belief that it was by Ghirlandaio, and asked defendant to investigate the possibilities thoroughly.

6.    This attribution was summarily rejected by François Borne, defendant Christie's resident expert of old master drawings at the time, who, on information and belief, reached his conclusion after examining the drawing for only about fifteen minutes.

7.    M. Borne erroneously and negligently dated it to the 19th century and said that it was by an unknown German artist.

8.    Defendant sold it at auction with that erroneous description, for approximately $22,000.

9.    Plaintiff Marchig has recently learned that the drawing is almost certainly by Leonardo da Vinci, that he created it in Italy in the late 15th or early 16th century, that many respected scholars have agreed, and that scientific testing has confirmed it.

10.    The drawing has been estimated to be worth about £100 million, or about $155 million.

11.   Defendant's actions were a breach of its fiduciary obligations to plaintiffs.

12.   Defendant was also negligent, breached certain warranties, and made false, careless and erroneous statements in connection with the auction and sale.

13.   Plaintiffs  are entitled to recovery of damages caused by defendant's actions and to other relief.

## THE PARTIES

14.   Plaintiff JEANNE MARCHIG ("Marchig") is a resident of Cologny, Switzerland and a citizen of Sweden.

15.   Plaintiff THE MARCHIG ANIMAL WELFARE TRUST ("Trust") is a charitable trust organized under the laws of England and Scotland in 1989, with a registered office at 10 Queensferry Street, Edinburgh EH2 4PG, Scotland, and is dedicated to the welfare of animals.

16.   Defendant CHRISTIE'S INC. ("Christie's") is, on information and belief, a New York corporation with a principal place of business at 20 Rockefeller Plaza, New York, New York.

## JURISDICTION AND VENUE

17.   This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1332(a)(2), in that it is between citizens or subjects of foreign states and a citizen of this State, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

18.   Pursuant to 28 U.S.C. § 1391(a), venue is proper in this district, in that the defendant resides in this district, a substantial part of the events or omissions giving rise to the claim occurred

in this district and the defendant is subject to personal jurisdiction in this district.  There is also an agreement between the parties placing venue in this district.

HISTORY OF THE RELATIONSHIP BETWEEN THE MARCHIGS AND CHRISTIE'S

19.  In 1955, plaintiff Marchig married Giannino Marchig (1897-1983).  He was a well-known artist and art restorer, with considerable expertise in Italian Renaissance art.

20.  In 1966, the Marchigs first made the acquaintance of Mr. Noel Annesley, who had then been employed by defendant Christie's for two years.

21.  Mr. Annesley has worked for Christie's ever since, and eventually became the Chairman and then Chairman Emeritus of Christie's, a title he still holds.  He resides in London, England.

22.  He is a well-known expert on Old Master drawings, and has published articles on their attribution.

23.  Over the years, the Marchigs and Mr. Annesley became personal friends and had a professional and trustful relationship.

24.  In addition to the drawing which is the subject of the present lawsuit, defendant Christie's accepted on consignment and sold many works of art for the Marchigs during their marriage, and for plaintiff Marchig herself after the death of her husband in 1983.

25. Those works were sold at defendant's auctions, continually since 1968, almost every year.

26.  Exhibit A is a table showing, in reverse chronological order, the dates and other details of auction sales of works consigned to defendant Christie's.  The works belonged to plaintiff Marchig, and  to her husband as well before he died.

27.  According to the table, defendant auctioned consigned works in the following months:

> June and July 1969
> July and December 1970
> July 1971
> July and December 1972
> October and December 1977
> July 1978
> May, July and November 1982
> November 1983
> March and July 1984
> December 1985
> July and December 1987
> February 1989
> February and May 1990
> January, June, November and December 1998
> July 1999
> July 2001
> December 2002
> April 2006
> July 2007
> July 2009

28.  As these sales demonstrate, plaintiff Marchig and defendant Christie's had an ongoing and continuous fiduciary relationship from 1969 until 2009, the dates of the first and last auction sales respectively.

29.  Letters between the parties describe some of these sales in more detail and are annexed as exhibits.

30.  For example, on May 5, 2001, plaintiff Marchig wrote to Mr. Annesley, offering some of Mr. Marchig's works for sale (see Exhibit B).

31.  In that letter, she notified Mr. Annesley and defendant that the proceeds of any sales would go to the plaintiff Trust.

32.  Thereafter, defendant sold a drawing by Tiepolo in July 2001 (see Exhibit C).

33.  In October 2005, defendant provided plaintiff Marchig with an estimate of the values of most of the paintings in plaintiff Marchig's list of May 2001, and offered to prepare them for sale (see Exhibit D).

34.  In April 2007, Mr. Annesley provided plaintiff Marchig with advice regarding her painting by Piero di Cosimo, and estimated the sale price as between £200,000 and £300,000 (see Exhibit E).

35.  In that letter, Mr. Annesley states, "Richard Knight and I thoroughly enjoyed our visit last Thursday, and both want to thank you for your hospitality including a delicious lunch.  I was touched to be reminded of the fact that you and I first met as long ago as 1966, only two years after I joined Christie's.  It is very rewarding to have an association that goes back over so many years."

36.  Defendant sold the painting by Piero di Cosimo in 2007, and a painting by Giuliano Bugiardini on July  7, 2009, and donated all of the proceeds from these sales to the plaintiff Trust.

## THE SALE OF THE DRAWING

37.  At the time plaintiff Marchig married Giannino Marchig, he owned a pen-and-ink drawing with pastel highlights, on vellum ("the Drawing").

-6-

38.   The Drawing is a portrait in profile of a young woman.   Its dimensions are approximately 33 x 24 cm.  A copy of the Drawing is annexed as Exhibit F.

39.   Upon his death in 1983, plaintiff Marchig became the sole owner of the Drawing.

40.   In 1997, plaintiff Marchig consigned the Drawing to defendant Christie's to be sold, intending to donate the proceeds of the sale to the plaintiff Trust in accordance with her past practice.

41.   On or about August 26, 1997, plaintiff Marchig entered into a consignment agreement with defendant Christie's, a copy of which is annexed as Exhibit G.

42.   Around the time of consignment, plaintiff Marchig informed both Mr. Annesley and François Borne, defendant's resident expert of old master drawings, of her late husband's belief that the Drawing was from the time of the Italian Renaissance, and that it was by Ghirlandaio.

43.  The Drawing is unusual in that it is on vellum, a material much less commonly used after the invention of canvas and paper in the 16th century.

44.  Despite plaintiff Marchig's assertions, M. Borne was adamantly of the opinion that the Drawing was a nineteenth-century German work of unknown authorship.  A copy of his letter to plaintiff Marchig, dated July 25, 1997, is annexed as Exhibit H.

45.   In his letter, Borne wrote, in French, "Your superb German drawing in the taste of the Italian Renaissance fascinates me.  I think it an object of great taste and I would be ready to try our luck with an estimate of $12,000 to 15,000 in New York.  As I told you I would be tempted to change the frame in order to make it seem an amateur object of the 19th century and not an Italian pastiche." (counsel's translation).

46.  On August 25, 1997, a representative of defendant wrote to plaintiff Marchig and described the Drawing as "a German drawing in the taste of the Renaissance" (counsel's translation).  A copy of the letter is annexed as Exhibit I.

47.  Plaintiff Marchig had no expertise in drawings, and reluctantly acceded to M. Borne's attribution, relying upon his reputed expertise with Old Master drawings.

48.  Plaintiff Marchig had to accept M. Borne's attribution in order to have defendant undertake to sell the Drawing.

49.  When plaintiff Marchig sent the Drawing to defendant, it was in an Italian frame.

50. Without plaintiff Marchig's knowledge or consent, M. Borne, and/or someone else at defendant Christie's, changed the frame of the Drawing, and it was sold with a different frame from the one in which it had been delivered.

51.  Plaintiff Marchig did not consent to change the frame.

52.  Christie's has never returned the original Italian frame to plaintiff Marchig.

53. The Drawing was listed in the auction catalog as "the property of a lady" and "German, 19th Century."  A copy of defendant's record of the sale is annexed as Exhibit J.

54.  The Drawing was sold at a public auction in January 1998, along with several other works which plaintiff Marchig had consigned to Christie's, including drawings by Domenico Tiepolo and Gianbattista Tiepolo.

55.  The Drawing was purchased at the auction by Kate Ganz, a New York City art dealer, for $21,850.

56.   Plaintiff Marchig later received the proceeds from defendant, less its commission, and donated the proceeds to the plaintiff Trust.

THE DRAWING IS ATTRIBUTED TO LEONARDO DA VINCI<br>BY CONVINCING SCIENTIFIC AND STYLISTIC EVIDENCE.

57.   In July 2009, Mr. Annesley of defendant Christie's called plaintiff Marchig, and informed her for the first time about claims that the Drawing was by Leonardo da Vinci.

58.   Plaintiff Marchig was devastated by this news, and shocked that defendant had failed to attribute the Drawing properly before selling it on her behalf.

59.   Plaintiff Marchig has since July 2009 researched the question of the Drawing's attribution, and has collected clear and convincing evidence that the Drawing is indeed an authentic work by Leonardo da Vinci.

60.   Among the evidence of this attribution is a small fingerprint and a fragment of a palm print on the Drawing, which match that on a painting known to be by Leonardo da Vinci

61.   The Institute for Particle Physics in Zurich, Switzerland, performed a carbon-14 analysis of the Drawing, and concluded that it was almost certainly created between 1440 and 1650.

62.   This contradicts the defendant's conclusion that the Drawing is from the 19th century, as M. Borne had insisted.

63.   In April 2010 a book was published setting forth in great detail the artistic and scientific evidence for the attribution of the Drawing to Leonardo da Vinci.

64. The authors are Martin Kemp and Pascal Cotte, and the title of the book is *La Bella Principessa: The Story of the New Masterpiece by Leonardo da Vinci* (Hodder & Stoughton, 2010).

65. Martin Kemp is Emeritus Professor in the History of Art at Oxford University in England, and has published extensively on Leonardo da Vinci.

66. Pascal Cotte is an engineer and optician, and the inventor of the first multi-spectral high-definition camera. He is the co-founder of a company called Lumière Technology, in Paris, France.

67. Lumière Technology has scanned and analyzed many well-known works of art, including the Mona Lisa by da Vinci, and hundreds of works of art by Rubens, Delacroix, Rembrandt, Chagall, Picasso, Renoir, Van Gogh and others.

68. The company has established the correct attribution of many works of art through its scientific methodology and stylistic comparisons.

69. Using the camera, M. Cotte has identified fragments of a fingerprint and a palm print on the Drawing, and compared them to fragments on a known work by Leonardo, *St. Jerome* in the Vatican.

70. Both M. Cotte and a Montreal-based forensic art expert named Peter Paul Biro have concluded that the fragments are "highly comparable."

71. An article about M. Cotte's research was published in October 2009 in the Antiques Trade Gazette, describing Biro as "pioneering fingerprint studies to help resolve authentication and attribution issues of works of art." A copy is annexed as Exhibit K.

72.   A group of eminent Italian art historians believe the Drawing to be by Leonardo da Vinci, according to the article in the Antiques Trade Gazette.

73.   Among these art historians are Alessando Vezzosi, Director of the Museo Ideale in Vinci, Italy;  Christina Geddo, an expert on the da Vinci school; Mina Gregori, an expert on Florentine paintings; and Prof. Claudio Strinati, Head of the City of Rome Museums.

74.   In the article, Prof. Strinati is quoted as saying, "the portrait constitutes a valuable addition to Leonardo's oeuvre."  Exhibit K at 4.

75.   In the article, Prof. Carlo Pedretti, head of the Fondazione Pedretti for Leonardo studies, is described as "widely considered the doyen of Leonardo da Vinci expertise," and is quoted as saying, "this could be the most important discovery since the early 19th century re-establishment of the *Lady with the Ermine* as a genuine Leonardo."  Exhibit K at 4.

76.   Another expert, Nicholas Turner, formerly the Director of Drawings at the J. Paul Getty Museum in Los Angeles, and formerly Deputy Keeper in the Department of Prints and Drawings, British Museum, London, has issued a statement supporting his opinion that the Drawing is a work of Leonardo da Vinci.  A copy of his statement is annexed as Exhibit L.

77.   In October 2009, Time magazine published an article entitled "How a 'New' da Vinci was Discovered."  A copy is annexed as Exhibit M.

78.   According to the article, Alessandro Vezzosi identified the Drawing as by Leonardo da Vinci in his 2008 book, *Leonardo Infinito*.  He is quoted in the article as saying, "[t]here is some embarrassment out there.  Just looking at it, you know it isn't German."

79.  The article says that defendant Christie's "is wincing at the revelation." Exhibit M at 2.

80.  The Drawing is presently on public exhibition in Gotheborg, Sweden as a work of Leonardo da Vinci.

81.  On information and belief, the Drawing has been insured against loss or damage for a sum in excess of $100 million.

82.  A London art dealer named Simon Dickinson has estimated that the Drawing's value exceeds £100 million (Exhibit K at 3).

83.  In sum, there is overwhelming expert, esthetic, forensic and scientific evidence, as well as scholarly opinion, that the Drawing is by the hand of Leonardo da Vinci.

CHRISTIE'S ACKNOWLEDGES ITS FIDUCIARY
OBLIGATIONS AFTER THE ATTRIBUTION.

84.  In August 2009, plaintiff Marchig informed Mr. Annesley and defendant of her intention to hold Christie's responsible for the damages caused by the misattribution.  A copy of her letter is annexed as Exhibit N.

85.  In September 2009, plaintiff Marchig received a response from defendant's in-house counsel rejecting her claim.  A copy is annexed as Exhibit O.

86.  Despite rejecting her claim, the letter acknowledges defendant's continued responsibility and fiduciary obligations toward her.

87.  It states in pertinent part that "[y]ou are a very valued client at Christie's, as was your husband, and we are honored by the trust you have shown us."

88.   On or about September 29, 2009, Mr. Annesley sent a letter to plaintiff Marchig, enclosing a copy of the 1998 auction sale catalog in which the Drawing was listed.  A copy is annexed as Exhibit P.

89.  In the letter, Mr. Annesley states, "[w]e do find ourselves in an extraordinary situation, and I really do appreciate your concerns, and also your very friendly and positive approach.  I continue to feel that the best way forward is for each of us to alert the other with any developments as they take place."

90.  Around that time, Mr. Annesley and plaintiff Marchig met in London to discuss the Drawing.

91.  On or about October 13, 2009, Mr. Annesley wrote again to plaintiff Marchig regarding that meeting.  A copy of his letter is annexed as Exhibit Q.  He said "this new attribution raises a whole host of questions...Our advice continues to be that we simply await further developments."

92.  On or about January 7, 2010, Mr. Annesley sent an email to plaintiff Marchig (copy annexed as Exhibit R), stating "[i]n keeping with our efforts to keep each other fully informed of developments regarding the so-called 'La Bella Milanese,' I wanted to bring to your attention the January issue of Art News."

93.   Defendant's correspondence and meetings with plaintiff Marchig following the attribution to Leonardo demonstrate the continued existence of a fiduciary relationship, and defendant's intentions to fulfill its obligations thereunder.

FIRST CLAIM
(Breach of Fiduciary Duty)

94.  Plaintiffs re-allege paragraphs 1 through 93.

95. As the consignee of the Drawing, defendant was plaintiffs' agent.

96.  Auction houses such as defendant Christie's are fiduciaries with respect to consignors of works for sale.

97.  As such, defendant had obligations to act in the utmost good faith and in the sole interests of plaintiffs throughout their relationship.

98.  Plaintiffs selected defendant as their agent because of their special fitness for the performance of the duties to be undertaken.

99.  Plaintiff Marchig and her late husband had consigned other works of art for sale with defendant over the years, and had placed complete trust and confidence in defendant's skill and knowledge of the art market.

100.  The relation between plaintiff Marchig and defendant subsisted for forty-three years, from 1966 until September 2009.

101.  Defendant is widely known in the art market for its special skill with and knowledge of drawings, and particularly Old Master drawings.

102.  Defendant failed to act in a manner commensurate with its skill and expertise.

103.  Defendant failed to act in accordance with the standards required of a highly skilled auction house.

104.   Defendant failed to ascertain the correct age of the Drawing by methods and techniques which were well-known, scientifically reliable, and readily available to it at the time.

105.   Defendant failed to perform any stylistic, historical or scientific investigation of the attribution and origins of the Drawing by methods and techniques which were well-known, scientifically reliable, and readily available to it at the time.

106.   Defendant failed to undertake any investigation whatsoever as to the validity of plaintiff Marchig's belief that the Drawing dated from the Italian Renaissance, and might have been by Ghirlandaio.

107.   Defendant unreasonably rejected outright plaintiff Marchig's belief that the Drawing dated from the Italian Renaissance, and might have been by Ghirlandaio.

108.   Defendant's insistence and conclusion that the Drawing was of German origin from the 19th century was contrary to the evidence and expertise readily available to it at the time.

109.   In fact, there is no evidence whatsoever for the defendant's erroneous attribution, and, on information and belief, it was based upon M. Borne's arbitrary and unsupported opinion, arising solely from a cursory and superficial visual examination of the Drawing.

110.   On information and belief, he examined the Drawing for approximately fifteen minutes, and performed no other testing on it.

111.   Defendant's investigation of the attribution of the Drawing was inadequate, and failed to comport with the standards to be expected of a reputable auction house and its in-house experts.

112.   As a result of defendant's failure to discharge its fiduciary obligations, plaintiffs were damaged financially, in that the Drawing was sold for a small fraction of its actual value.

113.  Plaintiff Marchig would not have consigned the Drawing to defendant for sale had she known that the Drawing was by Leonardo da Vinci.

114.  Plaintiffs are entitled to damages in an amount to be determined.

SECOND CLAIM<br>(Breach of Warranty)

115.  Plaintiffs re-allege paragraphs 1 through 93.

116.  The consignment agreement was drafted by defendant.

117.  The agreement does not disclaim any warranties with respect to attribution.

118.  Defendant is obliged and warrants to attribute consigned works correctly.

119.  Such obligations and warranties are imposed by contract and by statutory, regulatory and common law.

120.  Defendant erroneously identified the Drawing as a German drawing from the 19th century, when it is actually a 15th century drawing by Leonardo da Vinci.

121.   The defendant's misattribution is a breach of the warranty contained in the consignment agreement.

122.  The defendant's misattribution is a breach of warranty obligations imposed upon it by statutory, regulatory and common law.

123.  Plaintiffs have been damaged by defendant's breach of its warranty to correctly attribute the Drawing before offering it for sale.

124.  Defendant is entitled to damages in an amount to be determined.

THIRD CLAIM
(Negligence)

125.   Plaintiffs re-allege paragraphs 1 through 93.

126.   Defendant had a duty to plaintiffs to act as a reasonably prudent expert auction house in preparing the Drawing for sale, and to advertise and promote the sale so as to realize the highest possible price for its consignors, the plaintiffs.

127.   Its obligations included but were not limited to correctly attributing the Drawing to the artist who created it, and correctly estimating its age and place of origin.

128.   Defendant failed to do either.

129.   Defendant had a duty to use due care which was reasonable under the circumstances to ascertain the creator, age and place of origin of the Drawing.

130.   Defendant was under an obligation to obtain the best possible price for the Drawing.

131.   Defendant failed to exercise due care, and to act as a reasonably prudent expert in its dealing with plaintiffs.

132.   Defendant was negligent in discharging its obligations to plaintiffs.

133.   Plaintiffs have been financially damaged by defendant's negligence.

134.   Defendant's negligence was the proximate cause of plaintiffs' damages.

135.   Plaintiffs are entitled to damages in an amount to be determined.

FOURTH CLAIM
(Negligent Appraisal or Representation)

136.   Plaintiffs re-allege paragraphs 1 through 93.

137.  Defendant and its employees and agents made statements to plaintiffs, and to the general public in its auction catalog, that the Drawing was "German School, early 19th Century," that it was "a German drawing in the taste of the Italian Renaissance," that it was advisable to "change the frame in order to make it seem an amateur object of the 19th century and not an Italian pastiche," and that it was "a German drawing in the taste of the Renaissance."

138.  These statements were false and erroneous when made.

139.  Defendant should have known that the statements were false and erroneous, because such statements were within its specialized knowledge and expertise, and a reasonable investigation would have demonstrated that the statements were false and erroneous.

140.  As a fiduciary, defendant was under a duty of care to provide correct, accurate and complete information as to the attribution of the Drawing to plaintiffs.

141.  Defendant possessed specialized knowledge or expertise in the attribution of drawings consigned to it for sale.

142.  Defendant knew that plaintiffs required correct, accurate and complete information in order to sell the Drawing at the highest possible price.

143.  Defendant knew that plaintiffs intended to rely and act upon the information provided by defendant as to the attribution of the Drawing.

144.  Defendant knew that plaintiffs would be damaged by false or erroneous information as to the attribution of the Drawing.

145.  Plaintiffs had the right to rely upon defendant for correct and truthful information as to the attribution of the Drawing.

146.   Plaintiffs did so rely, by permitting defendant to sell the Drawing on their behalf under the mistaken belief that defendant's statement was true and correct.

147.   Plaintiffs placed complete trust and confidence in defendant to correctly attribute the Drawing.

148.   Defendant willfully failed and refused to evaluate plaintiffs' belief as to the attribution of the Drawing, and summarily rejected that belief without any investigation.

149.   Defendant's false statement of attribution damaged plaintiffs, and defendant is liable for damages in an amount to be determined.


FIFTH CLAIM
(Replevin and Conversion)

150.   Plaintiffs re-allege paragraphs 14 through 18 and 49 through 52.

151.   In November 1997, plaintiff Marchig caused the Drawing to be delivered to defendant in New York.

152.   At that time, the Drawing was in an Italian frame, which it had been in since before 1955.

153.   Prior to placing it for auction, defendant changed the frame on the Drawing.

154.   The changing of the frame was done without plaintiff Marchig's consent.

155.   The original Italian frame was not part of the consigned drawing, and was not part of the auction sale.

156.   Defendant did not return the frame to plaintiff Marchig.

157.   Plaintiff Marchig believes that the frame is still in the possession of defendant Christie's.

158.   Plaintiff Marchig has demanded that defendant return the frame to her.

159.   The demand was made by plaintiffs' attorney to defendant's attorney on or about June 2, 2010 by email.

160.   Defendant's response, by email the same day, was that "I will get back to you about the frame when I have been able to gather information." A copy of the response and the demand (one document) is annexed as Exhibit S.

161.   Defendant has not responded further to plaintiffs' demand, and has not offered to return the frame.

162.   The frame is the property of plaintiff Marchig and she is entitled to immediate possession thereof.

163.   In the alternative, in the event the frame is no longer in possession of the defendant, plaintiff Marchig is entitled to the present value of the frame.

WHEREFORE, plaintiffs demand damages on their first, second, third and fourth claims against defendant in amounts to be determined, together with interest, costs and disbursements of this action, on their fifth claim for an order directing defendant to return the frame to them forthwith, and in the alternative, for the value of the  frame, together with such further relief as may be just.

Dated: New York, New York
      August 13, 2010

                                                LAW OFFICES OF RICHARD A. ALTMAN
                                                Attorneys for Plaintiffs
                                                285 West Fourth Street
                                                New York, New York 10014
                                                212.633.0123
                                                altmanlaw@earthlink.net
                                                artesq@earthlink.net